IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs October 30, 2018

**STATE OF TENNESSEE v. DAVID WILLIAM GARY**

**Appeal from the Criminal Court for Knox County**
**No. 107932   Steven Wayne Sword, Judge**

_____

**No. E2018-00194-CCA-R3-CD**

_____

A Knox County Criminal Court Jury convicted the Appellant, David William Gary, of rape, and the trial court sentenced him to ten years in the Tennessee Department of Correction. On appeal, the Appellant contends that the evidence is insufficient to sustain his conviction, that the trial court erred by allowing testimony regarding his expressed interest in a specific type of sexual activity, and that the trial court erred by refusing to allow him to present evidence that a police investigator improperly influenced the victim's preliminary hearing testimony. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk (on appeal) and Eric M. Counts (at trial), Knoxville, Tennessee, for the Appellant, David William Gary.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Knox County Grand Jury indicted the Appellant for attempted first degree murder and aggravated rape. The victim of both offenses was B.T.[1]  The charges

---
[1] It is the policy of this court to refer to victims of sexual crimes by their initials.

stemmed from an incident that occurred at the Inn of Knoxville on the morning of November 17, 2015. The jury convicted the Appellant of the lesser-included offense of rape, and the trial court sentenced him as a Range I, standard offender to ten years in the Tennessee Department of Correction. The jury acquitted the Appellant of attempted first degree murder and could not reach a verdict on a lesser-included offense. The Appellant later pled guilty to aggravated assault and received a concurrent sentence of three years.

At trial, the thirty-five-year-old victim testified that in November 2015, she was living with her twin sister in an apartment in Knoxville. The victim and her sister were prostitutes, and the victim knew the Appellant because he had been to their apartment, had paid to have anal sex with her sister "on a regular basis," and had paid the victim one time to have vaginal sex with him after she had refused to have anal sex.

The victim said that on the morning of November 17, 2015, some friends left her at the Regency Inn on Magnolia Avenue. She began walking on "5th or Woodbine," and the Appellant stopped his vehicle and asked if she needed a ride. The victim got into the Appellant's vehicle. He asked her to contact her sister because he wanted to engage in anal sex, but the victim was unable to contact her sister. The victim told the Appellant "very clearly" that she would not engage in anal sex, and he offered to pay her for vaginal sex. The victim agreed, and the Appellant asked where they could go. At the victim's suggestion, they stopped at the Inn of Knoxville. Before they left the vehicle, the Appellant paid the victim sixty dollars and told her to leave her belongings in his vehicle. The victim complied and led the Appellant into the laundry room because she knew the room did not have security cameras.

The victim said that they went into the laundry room and that the Appellant stood behind her and penetrated her vagina with his penis. The victim said that the Appellant then penetrated her anus with his penis "as hard as he could" and that she began to bleed. She screamed and begged him to stop, but he refused. He put his hand over her mouth and told her to "[s]hut up and stay still." Afterward, he told her to "wipe off" with a towel that was in the laundry room. The victim cried as they walked back to the Appellant's vehicle. She told him that she was going to call the police because "that wasn't agreed upon." The Appellant did not respond but was clearly angry.

The victim said that the Appellant got into the driver's side of his vehicle and that she went to the passenger side to get her belongings. The Appellant rolled down the passenger-side window but would not unlock the door. The victim reached through the window, unlocked the door, and grabbed her leather coat and purse. The victim said that the Appellant "pull[ed] off real fast." The victim yelled at the Appellant and again threatened to call the police. The Appellant stopped his vehicle in the parking lot, got out, and ran toward the victim. The victim thought the Appellant was going to hit her

and said, "Please, I've got kids." She did not see the Appellant with a knife but felt him stab her in the abdomen. He immediately ran back to his vehicle and drove away.

Initially, the victim did not realize she was seriously injured. She said, "I had three people walk over me and wouldn't help me at all." She tried to call 911 but was unable to complete the call because her hands were too bloody, and she was "holding [her] stomach in." She managed to call her friend, Tina Hackler, whose number was on "speed dial." She told Hackler that she had been raped and stabbed and asked her to come to the motel. The victim walked toward the motel office and collapsed on the sidewalk outside the office.

The victim said that Hackler found her on the ground outside the office. The victim asked Hackler not to call anyone because she "just wanted to die," but Hackler called 911. The State played a recording of the 911 call, and the victim said she was "the person who's screaming in the background." She acknowledged that before the ambulance arrived, she offered Hackler money to get crack cocaine for her. The victim surmised that she asked for the crack cocaine because she was "in shock" and had been addicted to drugs since she became a prostitute when she was fifteen years old. Hackler remained with the victim until the ambulance arrived.

The victim testified that she was hospitalized for four days. During her hospitalization, a sexual assault examination was performed, and she had "exploratory surgery" that involved an incision "from [her] breast bone to [her] pelvic [bone]." She was given five or six pints of blood and "a lot" of pain medication. The victim did not recall talking with a police officer or with April Freeman, a sexual assault nurse examiner. At the time of trial, the victim said that she had "healed on the outside" but that she continued to suffer mentally and had pain, nightmares, and difficulty eating.

The victim said that she identified the Appellant from a photograph lineup and at the preliminary hearing. The victim denied taking the Appellant's wallet. She acknowledged that she had been arrested previously and said that during one of the arrests, she panicked and gave the police her sister's name. She said she told the officers the truth "before we ever drove off." The victim acknowledged that she had been convicted of criminal impersonation and theft.

The victim said that before trial, she was living "on the streets. . . . I was actually in Memphis." The State provided a bus ticket for her to return to Knoxville. The State also promised to set aside an attachment that had been issued after she failed to appear in sessions court in another case. She said that case was still pending.

On cross-examination, the victim acknowledged that she had been drinking alcohol before the offense. The victim explained, "I was drinking earlier that night, the

night before or morning. . . . I have no clue what time it was. It was the night before, because I had sobered up, and [my friend] was going to drop me off."

The victim acknowledged that she testified at the preliminary hearing that she had to have stitches because of the anal penetration. However, she later discovered that she did not need stitches. The victim said she was heavily medicated at the time of her sexual assault examination and did not recall telling the nurse examiner that she met the Appellant for oral sex.

The victim said that the Appellant usually paid one hundred dollars for sex, that she had agreed to have oral and vaginal sex with him only one time before the offense, and that he had paid her one hundred dollars. However, on the day of the offense, he told her that he would pay her only sixty dollars because she had refused to engage in anal sex. She denied that the Appellant initially paid her forty dollars for vaginal sex and later paid her an additional twenty dollars for anal sex. The victim could not recall if she had oral sex with the Appellant on the day of the offense. She acknowledged that she "probably" used narcotics the night before the offense, explaining that she was an addict.

The victim did not recall the Appellant saying anything when he stabbed her. She said that after the Appellant got out of his vehicle, he "ran at [her] like a football player," stabbed her, ran back to his vehicle, and quickly drove away. She thought he stabbed her because she was threatening to tell the police he raped her. The victim said that at the time of the offense, she did not have a kitchen knife or any type of weapon in her possession.

The victim "vaguely remember[ed]" seeing Investigator Chas Terry in the hospital, noting, "I was heavily medicated. There's a lot of stuff that is very choppy after I got stabbed." She did not recall telling Investigator Terry that the Appellant threatened to kill her before he stabbed her. The victim denied telling Hackler that "this was about money" and stated that "it's never been about money."

Tina Trevino testified that she worked as a dental hygienist at Aspen Dental in Sevierville for almost two years. In November 2015, the Appellant had been working there for six months. While conducting an examination on November 16, 2015, the Appellant showed a patient's father a knife he had just purchased. The knife was approximately eight or nine inches long and had a black handle and a black blade. The Appellant mentioned that he "really liked the . . . safety feature that it had [because] it didn't lock as you use the knife." Trevino asked the Appellant why he brought the knife to work, and the Appellant responded, "You never know when you might need one." Trevino said that she "didn't believe a lot of stuff [the Appellant] would say" and that she thought he was "[p]robably not very truthful."

- 4 -

Jeff Newman, the lab manager at Aspen Dental, testified that in November 2015, he had worked with the Appellant for approximately six months and that they were friends. The Appellant told Newman that he had a "collection of firearms." Occasionally, the men sat in the Appellant's dark brown Porsche Cayenne, and the Appellant showed Newman some of his firearms. Newman knew the Appellant also had a few knives. Specifically, Newman recalled that during the weekend before the incident, the Appellant had purchased a knife. He brought the knife to work on November 16. The knife was black, approximately six inches long, and in the Appellant's pocket. The Appellant told Newman the knife had safety features that prevented "it from closing up on your hand."

Newman said that when he arrived at work on the morning of November 17, he saw the Appellant in the parking lot behind the building. The Appellant was "wiping the knife down" with a white cotton towel that looked like the ones used by Aspen Dental. Newman spoke to the Appellant and went inside the building. Shortly thereafter, the Appellant came inside the building, and the two men ate breakfast in the breakroom. Newman did not notice anything unusual about the Appellant's behavior or their conversation.

Newman said that around 4:00 p.m., he heard a report on the radio that the police were looking for a man driving a Porsche who had stabbed a woman that morning. Newman recalled seeing the Appellant with a knife and jokingly told the Appellant that the police must be looking for him. The Appellant "[s]tarted running around looking out the back door, and—and just was really nervous and totally opposite of what his normal demeanor was."

Newman said that in response to the Appellant's erratic behavior, he got on the internet to look for more details about the suspect. Newman learned the police were searching for "a black man driving a Porsche Cayenne," and he became suspicious of the Appellant. About 6:30 p.m., the Appellant "disappeared from work for a little while" and he was sweating when he returned.

The next morning, the Appellant sent Newman a text message stating that he had spent the previous night with his daughter, who was in a hospital. The text message included a photograph of the Appellant's daughter in the hospital. Newman said that on November 20, Aspen Dental's regional manager advised the employees to stay away from the office that day because he feared the Appellant would come to work "and try to retaliate." The Appellant called Newman that day and asked if he "had heard anything about the office."

Newman said that he and the Appellant were friends and that they talked about personal matters, including sex. On more than one occasion, the Appellant told Newman

that he had a preference for anal sex. The Appellant showed Newman "[p]ictures that ladies had sent to him" that reflected his preference for anal sex.

Newman said that sometime after November 17, he was in the office's parking lot and saw the towel the Appellant had been using to wipe off the knife. He also saw a tube of sexual lubricant at the end of the parking lot. Newman told the police about the items, but they were not collected for almost a year. Newman said the Appellant was known for being dishonest.

On cross-examination, Newman said that the blade on the Appellant's knife was approximately two or three inches long. Newman denied that he ever showed the Appellant pornographic photographs. Newman acknowledged that he did not know who put the tube of lubricant in the parking lot.

Newman said that he had considered the Appellant to be a good friend. The Appellant was married, had five children, and was the sole provider for his family. The Appellant never told Newman that he moved to Tennessee from Texas because he was "in desperate need of a job" after his office manager embezzled $250,000 and ruined his dental business.

On redirect examination, Newman said that the Appellant bought expensive firearms and knives, that he paid to have sex with prostitutes, and that he never said he had money problems. Newman agreed it was odd that the Appellant did not tell him about the employee's embezzlement, noting that the Appellant had talked as if he owned other businesses, including a laundromat.

April Freeman, an employee with the Sexual Assault Center of East Tennessee, testified that she was a sexual assault nurse examiner. On November 17, 2015, Freeman went to the hospital to examine a possible sexual assault victim. Freeman saw the victim around 3:00 p.m. after the victim was released from surgery. The victim was sedated, intubated, and not responsive. After discussions with the doctor, nurse, and detective, Freeman postponed the victim's examination for a couple of hours.

Freeman said that she returned around 9:40 or 10:00 p.m. and that the victim was no longer on a ventilator. After Freeman introduced herself and explained her services, the victim said she had been assaulted and wanted a sexual assault examination performed. The victim was in "excruciating pain," so Freeman again postponed the examination until the victim's pain was managed.

Freeman said that on November 19, the victim's pain was under control, so she was able to examine the victim. The victim was calm and cooperative. The victim told Freeman

that she'd gotten into a car and that she had been paid for a sexual act, vaginal sex, but when they got into the laundromat, that he started getting rough with her. She got scared, and he put his penis into her rectum, and she told him to stop, and that he ejaculated inside of her.

. . . .

. . . . She said that she had stuff in his car, and she asked him to let her get her stuff. Rolled down the window. She reached in to open the door, told him she was going to call the police, and when she turned to leave, she was walking away, he got out of his car and said, "I'm going to kill you," and then stabbed her in the abdomen and ran away, got into his black car and drove away.

The victim told Freeman she had bathed, showered, urinated, brushed her teeth, and changed her clothes since the assault.

During the examination, Freeman noticed that the victim had bandages on her abdomen. Freeman took external anal swabs but did not perform an internal rectal exam because of the risk of further injury to the victim. Freeman acknowledged that the victim could have had an internal injury as a result of anal penetration and that it might not have been detected by an external examination. Freeman examined the victim forty-eight hours after the injury and noted that any injury could have healed. Freeman further noted that it was not uncommon for a victim of sexual assault to have no visible injuries.

The parties stipulated to the introduction of the victim's medical records from the University of Tennessee Medical Center. Freeman read from the records that on November 17, the victim was given Dilaudid, a narcotic pain medication, and Lorazepam, an anti-anxiety medication. Freeman said it was common for a person given heavy narcotics and anti-anxiety medication to be unable to fully report what had happened.

On cross-examination, Freeman said that the victim did not report using drugs or alcohol before or after the assault. Freeman said that when she spoke with the victim on the night of November 17, the victim said that she had met the Appellant for oral sex. The victim was in obvious pain and asked for pain medication, but she had been given pain medication one hour earlier. The victim declined any further examination until her condition improved. Freeman acknowledged that when she saw the victim two days later, the victim said she met the Appellant for vaginal sex. Freeman refused to say that

the victim "changed her story," explaining that the victim "wasn't on as much pain medicine."

Freeman said that she completed her examination and collected evidence for a sexual assault kit, including two anal swabs. The victim's hospital records indicated a total of sixty dollars was collected from the victim's belongings: twenty dollars and then forty dollars. Freeman did not know if the forty dollars was found "afterwards" or if "it was in her belongings. I'm not sure. It doesn't say."

On redirect examination, Freeman agreed that the victim would have bled to death without medical intervention.

Knoxville Police Investigator Chas Terry testified that on November 17, 2015, he went to 1500 Cherry Street in response to a report of a possible sexual assault and stabbing. Upon his arrival, he learned that the victim had been taken to the hospital. Investigator Terry spoke with Hackler and Hackler's boyfriend at the scene. Investigator Terry learned the perpetrator was a black male in his late thirties or early forties who was driving a dark-colored, possibly black, sport-utility vehicle (SUV). Investigator Terry retrieved security videos from the motel office and watched the videos before going to the hospital to see the victim.

Investigator Terry said that the victim was unable to talk with him that night but that he spoke with her at the hospital a couple of days later. When they spoke, the victim "was not in good condition," "could barely talk," and "was obviously in a significant amount of pain and discomfort." The victim identified the Appellant as the perpetrator. The victim acknowledged that she had "consented to some form of sexual intercourse" with the Appellant but asserted that he had anally raped her.

Investigator Terry stated that near the beginning of the investigation, he received a call from a staff member at Aspen Dental who identified the Appellant as a possible suspect. The caller said the Appellant had a vehicle matching the description of the suspect's vehicle, namely a dark-colored Porsche Cayenne. On November 20, Investigator Terry called the Appellant and asked him to come to the police station. The Appellant said, "I'll do that, but first I would like to contact my attorney. . . . I will call you right back." The Appellant did not return Investigator Terry's call.

Investigator Terry said that he began attempting to locate the Appellant but that "it soon became painfully obvious that [he] was no longer in the area." One of the Appellant's neighbors had seen the Appellant's family loading their belongings into a minivan and leaving on November 20. Investigator Terry knew the Appellant was married and had several small children. He wanted to make sure the family had left willingly and had not been taken by force. Investigator Terry spoke with members of the

Appellant's wife's family who confirmed that the Appellant's family was in Minnesota and gave Investigator Terry the family's address.

Investigator Terry contacted Minnesota authorities, and the Appellant was arrested and returned to Knoxville. After securing a search warrant, Investigator Terry obtained a DNA sample from the Appellant.

Investigator Terry said that the victim identified the Appellant from a photograph lineup. Initially, Investigator Terry was not aware of the severity of the victim's injuries. He eventually learned that she was hospitalized for seven days, that her hepatic artery had been severed during the attack, that she lost a lot of blood, and that her condition had deteriorated as she was transported to the hospital.

The State showed the jury security video footage of the motel parking lot on the morning of the offense. The video showed the Appellant's vehicle arriving in the parking lot around 8:03 a.m., and the Appellant and the victim exiting the vehicle. Another part of the video showed that at 8:26 a.m., the Appellant and the victim exited the laundry room and walked toward the Appellant's vehicle. The victim appeared to be holding a white towel. The Appellant got into the driver's side of his vehicle. The victim was standing outside the vehicle trying to open the front passenger door. When the door opened, the victim took her coat out of the vehicle, and the Appellant drove away at a high rate of speed. Before he left the parking lot, the Appellant stopped the vehicle, got out, and closed the passenger door. He ran to the victim, stabbed her, and she fell to the ground. The Appellant did not appear to take anything from the victim before he ran back to the vehicle. Investigator Terry said the police were unable to recover the weapon that the Appellant used to stab the victim.

On cross-examination, Investigator Terry acknowledged that he could not determine from the video if the victim was in pain as she was walking from the laundry room to the Appellant's vehicle. In his report, Investigator Terry stated that he did not observe any violence between the Appellant and the victim as they walked to the vehicle.

Investigator Terry said that many of the prostitutes he had encountered were homeless and victims of rape. He acknowledged that some prostitutes carried weapons to protect themselves.

Investigator Terry said he called the Appellant a couple of days after the offense. He did not go to the Appellant's home because he knew that the Appellant had weapons, that the Appellant's wife and small children were in the home, and that the Appellant had committed a stabbing. Investigator Terry feared that if the police appeared at the Appellant's house "demonstrating a show of force," it could "create a hostage situation."

On redirect examination, Investigator Terry said that warrants for the Appellant's arrest were issued on November 19. Before the Appellant and his family moved, they emptied their bank account. Their telephone numbers were changed several times after they moved.

On recross-examination, Investigator Terry acknowledged that when he spoke with the Appellant on November 20, he did not reveal that the arrest warrants had been issued. After the Appellant was arrested in Minnesota, he "eventually" waived extradition and agreed to return to Tennessee.

The parties agreed to the following stipulation:

> Exhibit 11 is a report from Special Agent Hugh Proctor who is a serologist with the Tennessee Bureau of Investigation. This is an official biology report, and the report shows that Agent Proctor performed DNA testing on the anal swabs taken from [the victim] at UT Hospital on November the 19th, 2015, and compared it with the buccal swabs that were collected from the [Appellant], and the evidence—the report shows that the [Appellant's] DNA was found in the sperm fraction of the buccal of the anal swabs taken from [the victim's] body on November the 19th.

Defense counsel also stipulated that identity was not an issue and that the Appellant had sexual intercourse with the victim.

The Appellant testified that he was a general dentist and that he was employed at Aspen Dental at the time of the offense. On the morning of November 17, 2015, he left his house to go to the bank. As he was driving to the bank, he saw the victim, who he knew was a prostitute. He said that they had seen each other at least four times and that they always did "the same three things. It's oral sex, anal sex, and vaginal sex." The Appellant acknowledged that he knew the victim's sister, who was also a prostitute, and that he had engaged in sex with her on three or four occasions.

The Appellant said that he allowed the victim to get into his vehicle and that they agreed he would pay her forty dollars for anal sex. She asked if he wanted to go to her apartment. He asked if she still had the same address, and she responded that she had moved. The Appellant continued to drive, and they talked until the victim directed him to make a U-turn. The Appellant asked if the victim was okay, and she responded that she was "cool." The Appellant remarked that the victim smelled like alcohol, and she replied, "It's not that much liquor." The victim gave him directions to the Inn of Knoxville on Cherry Street, explaining that she had a room there.

The Appellant said that when they arrived at the motel, he gave the victim forty dollars from his wallet before they got out of the vehicle. The victim admitted that she did not have a room at the motel but said that she knew where they could go. The victim got out of the vehicle first. The Appellant hesitated but then followed her into the laundry room. The victim partially blocked the door with a large yellow bin and then bent over and pushed down her pants. When she stood up, the Appellant noticed that she had put a knife on the floor and placed her foot on top of the knife. The knife had a wood handle.

The Appellant said the victim knelt in front of him and performed oral sex on him. She then used a lubricant which she had brought with her to prepare for anal sex. After several minutes of anal sex, the victim said she was uncomfortable and suggested they have vaginal sex. The victim told the Appellant that if he would give her an additional twenty dollars, she would let him "finish" anally. The Appellant agreed. After they were finished and dressed, he gave her twenty dollars from his pocket.

The Appellant said they wiped off with some towels and walked out of the laundry room. As they were walking to his vehicle, the victim mentioned that she had seen money in his wallet and asked for more money. The Appellant refused and got into his vehicle. The victim's purse and leather coat were on the passenger seat of the vehicle, and she had a bottle containing a dark purple liquor on the floorboard. The Appellant's wallet was on top of the center console. The Appellant handed the victim her purse and leather coat through the open passenger window and leaned over to retrieve the bottle from the floorboard. As he did so, he knocked his wallet onto the passenger seat. The victim reached through the window, unlocked the door, and opened it. The Appellant surmised that the victim must have grabbed his wallet from the seat.

The Appellant said that as he began to drive away, the victim shouted, "F[**]k you, you stupid n[***]er. I got your sh[*]t, and you ain't going to do sh[*]t about it. I hope—I wish you'd come back." The Appellant looked around and noticed his wallet was missing. The victim had her leather coat in her right hand and his wallet in her left hand. The Appellant stopped the vehicle when he saw that the victim had his wallet. He ran toward the victim with his knife in his left hand, but he did not remember taking it out of his pocket. He reached toward the victim "with both hands at the same time" and grabbed his wallet, and the victim fell to the ground. The Appellant ran back to his vehicle. As he drove away, he looked in his rearview mirror and "could still see her agitated, swinging her arms, and hear her cursing me out." The Appellant thought that he "didn't really do anything to her, because she's still standing up." He said, "I had no intentions of hurting her. I know that I injured her. I did not know [to] what extent I injured her. It happened real quick."

The Appellant said that after leaving the victim, he drove to Sevierville to pay a speeding ticket. As he drove, he was shaking. He looked at the knife in his hand and noticed some blood on the blade. He wiped the blood off the blade with a tissue. After paying his speeding ticket, he went to work.

The Appellant said that he had several pocketknives. The pocketknife he had that day was approximately six inches long, and the blade was two and one-half inches long. The pocketknife was not new and did not open smoothly, so he took it to work to lubricate it with a substance the dental office used on stainless steel. The Appellant explained that when Newman initially saw him, the Appellant was shaking the excess lubricant off the knife. Later, Newman joked that the police were looking for the Appellant. When the Appellant asked what Newman was talking about, Newman responded that he had heard on the radio "that they're looking for a black guy driving a Porsche."

The Appellant said that he instantly became "paranoid" and started pacing. He called his wife, who did not know he had been seeing prostitutes. He told her that he "didn't do those things that they said [he] did" and that he had "cheated on her." The Appellant was embarrassed, afraid he would lose his family, and did not want his family exposed to the news about the offense. The Appellant said:

> I asked my wife where her family was from, and I loaded up our valuables, some kids' toys, and what money we had in the safe, which was about $200. The reason why I loaded up valuables was because I don't know how long this was going to take, and I wanted to make sure that my family would have some way of getting an income, meaning by pawning whatever jewelry, watches, firearms I had, and I moved my – my family to the only support system they have, which was Minnesota.

The Appellant acknowledged telling Investigator Terry that he would call Investigator Terry after he obtained an attorney. The Appellant said that he spoke with an attorney, who called Investigator Terry and left a voice mail message. The Appellant then saw a second attorney. The Appellant maintained that he was willing to speak with Investigator Terry.

The Appellant said that while in Minnesota, he secured housing for his family and called his mentor, whose daughter was an attorney. His mentor advised him to return to Tennessee, and the Appellant responded that he intended to return after he obtained an attorney. About that time, the Appellant was arrested by Minnesota authorities. He waived his extradition rights and voluntarily returned to Tennessee.

- 12 -

The Appellant said that he had always wanted to be a doctor. In 2012, he purchased a dental practice in El Paso, Texas. Within the first three months, the office manager embezzled a quarter of a million dollars from the business, which forced the Appellant to file bankruptcy and close the practice. The Appellant's wife did not work outside the home, and they had five children, so he looked for other employment. He thought the position at Aspen Dental "seemed okay," so he moved to Tennessee. His family joined him three or four months later. The Appellant said that while he was alone in Tennessee, he thought about the financial and legal troubles caused by the embezzlement. He became depressed and hired some prostitutes.

The Appellant acknowledged that before moving to Minnesota, he closed his local bank account, which had a balance of approximately $400. He explained that he needed the money for gas and food.

The Appellant said he did not try to kill the victim and denied vaginally or anally raping her. He maintained that he and the victim had consensual anal sex on at least three prior occasions. He stated that he was not concerned when he saw the victim's knife, noting that "she didn't threaten me with it or anything like that."

The Appellant said he stopped his vehicle in the parking lot because the passenger door "swung open." When he got out to close the door, he looked at the victim, and she taunted him with his wallet. He said that "the incident happened" when he "realized [his] wallet was missing, and then she started taunting [him] about having it, flailing her arms around." The Appellant said that his wallet contained his identification cards, which listed his address, and a spare key. He was concerned because the victim and her sister did not know his "real identity," and his identification cards would have provided them "access to [his] children." The Appellant did not think he had injured the victim until he noticed blood on the blade of the knife.

On cross-examination, the Appellant said that he had practiced dentistry in New Mexico, Texas, and Tennessee. He acknowledged that his license to practice dentistry had been suspended in all three states, but he did not say when the suspensions took effect. The Appellant said that he had been in the Air Force and that he had extensive firearms training. He collected knives, firearms, and "long arms and bow and arrows."

Regarding the knife, the Appellant said that it was "somewhere between here and Minnesota" and that he had "disposed" of it in a motel dumpster. The Appellant agreed that Newman had seen him with the knife he had used to stab the victim. The Appellant further agreed that he was calm when he arrived at work and that he became nervous and paranoid when Newman said the police were looking for him. The Appellant said he did not leave work but went outside "to get some air."

The Appellant said that the pocketknife was the only weapon in his possession on the morning of the offense and that the knife was in the left front pocket of his pants. He thought he must have removed the knife from his pocket and opened it after he began running toward the victim. The Appellant said he "inadvertently injured her with [his] knife." The Appellant said that the knife was "spring loaded," explaining that "[i]f you just apply a little pressure on the hilt of the knife on the blade part, it will pop open and lock open." He cleaned the victim's blood off the blade then closed the blade as he was driving. The Appellant denied telling Trevino that "[y]ou never know when you're going to need [a knife]."

The Appellant agreed that he worked at Aspen Dental on November 17. He said that later that evening, the news began broadcasting reports about the victim's stabbing. The Appellant did not go to work on November 18 and did not see any news reports that day because his infant daughter was in the hospital. He did not look at any news reports until he was in Minnesota. He acknowledged that he sent the owner of Aspen Dental a photograph of his daughter in a hospital bed even though he was not required to send it. He said the owner had sent a photograph of his daughter who was in the hospital with a broken arm.

The Appellant acknowledged that Investigator Terry called his cellular telephone on November 20. The Appellant denied "switching" telephones before going to Minnesota but acknowledged that he bought new cellular telephones in Minnesota. He explained that he heard a sound that made him think someone was tracking him.

The Appellant said that he "stayed to" himself at work and denied telling Newman that he picked up prostitutes. He acknowledged showing Newman photographs on his cellular telephone but said that "it was never of anal sex." He stated that he and Newman "joked around" and "showed each other porn pictures, [but] they were not the typical porn pictures. They were meant as a joke, . . . [i]t's nothing erotic at all."

The Appellant acknowledged that when he was arrested in November 2015, he was five feet, ten inches tall and weighed approximately 245 pounds. The victim was shorter than the Appellant, "slight in her build," and significantly smaller than he. The Appellant said he "reacted" when he saw that the victim had his wallet.

After his conviction the Appellant filed a timely notice of appeal. On appeal, the Appellant contends that the evidence is insufficient to sustain his rape conviction because the victim consented to anal sex, that the trial court erred by overruling his objection to the State's questioning Newman about the Appellant's interest in anal sex, and that the trial court erred by refusing to allow the Appellant to present evidence to suggest Investigator Terry improperly influenced the victim's preliminary hearing testimony.

- 14 -

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Rape is the "unlawful sexual penetration of a victim by the [Appellant]" and "[t]he sexual penetration is accomplished without the consent of the victim and the [Appellant] knows or has reason to know at the time of the penetration that the victim did not consent[.]" Tenn. Code Ann. § 39-13-503(a)(2). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the [Appellant's], or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Taken in the light most favorable to the State, the proof adduced at trial revealed that the Appellant picked up the victim, a prostitute whom he previously had paid for vaginal sex. The victim would not agree to participate in anal sex, so the Appellant asked her to call her sister, who had engaged in anal sex with the Appellant. After the victim was unable to contact her sister, the Appellant agreed to pay to have vaginal sex with the

victim. They drove to the Inn of Knoxville to complete the transaction. The Appellant paid the victim sixty dollars for vaginal sex, and they went into the motel's laundry room, which did not have security cameras. The Appellant penetrated the victim's vagina with her consent but then penetrated her anus without her consent. When she protested, he put his hand over her mouth and told her to be quiet and still. The victim said the penetration hurt. Afterward, the Appellant told her to wipe off with a towel. They returned to the Appellant's vehicle, and the victim retrieved her belongings. As the Appellant drove away, the victim shouted that she was going to call the police and tell them the Appellant had raped her. The Appellant immediately stopped his car in the parking lot, ran toward the victim, and stabbed her with a knife he had in his pants pocket. The Appellant acknowledged he stabbed the victim but said he did not know how seriously he injured her.

On appeal, the Appellant acknowledges that he engaged in vaginal and anal sex with the victim but contends that all of the acts were consensual. He maintains that because of the victim's prior convictions of criminal impersonation and theft and her use of "mind-altering narcotics and alcohol . . . near the time of the incident," her testimony was inconsistent and not credible. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, we conclude that the proof was sufficient to sustain the Appellant's conviction of rape.

## B. Testimony of the Appellant's Co-Worker

Immediately before trial, defense counsel moved to prohibit the State from introducing testimony from the Appellant's co-worker regarding the Appellant's statements about his sexual preferences and photographs or videos he had shared which depicted his preference for anal sex. Defense counsel initially stated, "I think that this is the state trying to use specific instances of conduct to—to prove action and conformity therewith, and I don't think that it's appropriate for [the jury] to hear that." Defense counsel argued that

> you'll have the testimony of the alleged victim of what happened. I think that you'll have evidence that [the Appellant] did have sex with [the victim] multiple times and had sex with . . . the victim's sister multiple times, and I think that there'll be testimony as to the fact that—that he had anal sex with these—with these two women, and the fact that he

showed videos or had locker room talk or whatever with a male coworker or talked about sexual exploits, the only purpose of that is to shock the conscience of the jury and to say, "Wow, what a perverted, deviant, bad guy."

Defense counsel contended that the evidence would be unfairly prejudicial. The State responded that the defense clearly intended to "vigorously attack" the victim's credibility, particularly on the issue of consent; accordingly, the testimony of the Appellant's co-workers was relevant to corroborate the victim's testimony regarding the Appellant's sexual preferences.

During direct examination, Newman testified that he and the Appellant were co-workers and that they had talked about sexual matters. Newman also considered the Appellant to be a friend. The Appellant told Newman that he had a preference for anal sex, and he showed Newman photographs that demonstrated his preference for anal sex.

The trial court, citing Tennessee Rules of Evidence 401, 402, and 403, held that the testimony was relevant on the issue of consent "to show that the victim, although she's willing to engage in sex for money, was not willing to engage in anal sex, and so if the [Appellant] had a particular desire for that type of sexual act, it would go to motive to pass up what she's willing to offer for money and force himself upon her." The court noted that the risk of unfair prejudice caused by the jury's thinking the Appellant was "this bad guy" because he had a particular sexual interest was "lowered" because the Appellant "admitt[ed] that he ha[d] engaged in anal sex with both of these women in the past." The court further explained that the Appellant had admitted he paid prostitutes for anal sex; therefore, "it's like it's not as bad to talk about it with a coworker than it is to engage in it. So he's—he's admitting to something I think is worse than what the [S]tate's trying to get in."

The Appellant also raised the issue in his motion for new trial. In denying the Appellant's motion for new trial, the trial court said:

> As to the testimony of Mr. Newman, I think that was the right decision for sure because the question was . . . did she consent to this particular type of penetration. That was the big issue, and so I felt like, and I think I'm right, that when she's saying, "I don't consent to that. I don't do that," and this is somebody that was insistent upon it and had a particular proclivity to the extent that shows that they really had a desire to do that, maybe a desire to the extent that that would overcome someone else's resistance to engage in it consensually, and that—I think I was right in that decision.

- 17 -

On appeal, the Appellant argues that the testimony should have been excluded under Tennessee Rule of Evidence 403. He further argues that Newman's testimony regarding the Appellant's sexual preferences could have been construed by the jury as "suggestive of questionable character." Specifically, the Appellant contends that Newman's testimony could have created the impression that the Appellant was a "vulgar, unprofessional person" because he discussed sexual matters with a co-worker at work. The State responds that the trial court did not err by admitting the evidence. We agree with the State.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

We agree with the trial court that Newman's testimony regarding the Appellant's professed preference for anal sex was relevant to the issues at trial and that, while prejudicial, its probative value was not substantially outweighed by unfair prejudice. Newman's testimony corroborated the victim's testimony that the Appellant preferred anal sex, that he asked the victim to contact her sister when the victim refused his request for anal sex, and that the Appellant had anal sex with the victim without her consent. Moreover, the Appellant admitted that he had anal sex with the victim and her sister on multiple occasions. Although the jury may have considered the Appellant's discussing sexual matters with a co-worker to be unprofessional, we cannot conclude that the evidence was so unfairly prejudicial that it substantially outweighed the probative value. Our supreme court has stated that

> Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

<u>State v. James</u>, 81 S.W.3d 751, 757-58 (Tenn. 2002) (citations and internal quotation marks omitted).  The trial court did not abuse its discretion in allowing the testimony.  <u>See</u> <u>State v. Maurice McAllister</u>, No. M2014-02022-CCA-R3-CD, 2015 WL 9181067, at *10 (Tenn. Crim. App. at Nashville, Dec. 16, 2015); <u>State v. Donald Korpan</u>, No. 89-261-III, 1991 WL 1345, at *6 (Tenn. Crim. App. at Nashville, Jan. 11, 1991).  The Appellant is not entitled to relief on this issue.

### C.  Investigator Terry

During trial, defense counsel informed the trial court that he wanted to question Investigator Terry about allegations that Investigator Terry improperly influenced the victim's testimony at the preliminary hearing.  The trial court held a jury-out hearing.  During the hearing, Janet Biggs testified that at the time of the preliminary hearing, she was a legal assistant for Pope and Associates.  At the request of defense counsel, Biggs took a copy of the victim's criminal history to the courtroom.  Biggs remained there to watch the preliminary hearing and sat in the second row.  Investigator Terry was sitting in the row in front her.  Biggs said that during the victim's cross-examination, the victim looked directly at Investigator Terry before answering every question.  Investigator Terry would nod "'yes' or 'no,'" and the victim would answer defense counsel's questions.  Biggs said that she saw Investigator Terry "give [the victim] the answer" three or four times.  After the preliminary hearing, Biggs told defense counsel what she had seen because she knew it was improper.

Defense counsel advised the trial court that he wanted to ask Investigator Terry "flat out" if Investigator Terry was giving the victim answers to questions at the preliminary hearing.  The trial court asked defense counsel, "Let's say that—let's say that he was. . . . What does that go to?"  Defense counsel surmised that the victim's memory of the events was questionable and that Investigator Terry had to help her "stay on task" at the preliminary hearing.  Defense counsel stated that he was not trying to impeach Investigator Terry but that he wanted to ask the officer "about what he did" because "the jury is entitled to know if an officer is influencing the testimony of a witness at any stage of the trial."  The trial court responded,

> You're talking about something that happened before, and you crossed her on prior testimony, but you can't ask him about her responses to—I mean, we don't even know that she was seeing anything, and, you know, come—I tell you from sitting up here over the last five years, everybody out there in the audience is shaking their heads yes and no.  It happens all the time.  Now we don't have any evidence that she saw that.  She—you should have asked her that question.

- 19 -

The trial court denied defense counsel's request to cross-examine Investigator Terry "about whether or not he was shaking his head yes or [no] when [the victim] testified." The trial court also ruled that Biggs' testimony regarding her observation of the victim's responses at the preliminary hearing was irrelevant.

On appeal, the Appellant contends that the victim's credibility as to whether she consented to the anal penetration was "critical" to the State's case; therefore, the trial court's refusal to allow him to present evidence that the victim needed visual cues from Investigator Terry to answer questions at the preliminary hearing violated his right to present a defense under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. We disagree.

Initially, we note that the Appellant did not cite to any rule of evidence at trial that would have allowed him to cross-examine Investigator Terry about possibly influencing the victim's testimony at the preliminary hearing, and he did not make an offer of proof regarding Investigator Terry's contemplated testimony. See Tenn. R. App. P. 36(a); see Tenn. R. App. P. 103(a)(2). He also does not cite to any rule of evidence on appeal. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). In any event, the Appellant essentially wanted to impeach the victim's credibility at trial by having Investigator Terry testify that he gave the victim visual cues during her preliminary hearing testimony. However, Tennessee Rule of Evidence 608(b) provides that "[s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence." "Extrinsic evidence is 'evidence that is calculated to impeach a witness's credibility, adduced by means other than cross-examination of the witness. The means may include evidence in documents and recordings and the testimony of other witnesses.'" Thomas L. Grimes v. Helen Cornell, No. M2010-01461-COA-R3-CV, 2011 WL 2015519, at *7 (Tenn. Ct. App. May 23, 2011) (quoting Black's Law Dictionary (9th ed. 2009)). Therefore, under the plain language of Rule 608(b), defense counsel's use of extrinsic evidence to impeach the victim would have been improper. Accordingly, the trial court did not abuse its discretion by ruling that the evidence was inadmissible. See State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002).

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 20 -